Next case on the argument calendar, Nevada Service Employees Union v. NLRB Please the court, my name is Glenn Rothner. I represent Petitioner Nevada Service Employees Union Local 1107. We petition for review on two discrete points, as to which we take issue with the contours of the board's decision, not the outcome. With those two exceptions, we fully support the board's decision. So at this point, I will address the two differences, and I will reserve the balance of my time for rebuttal to the hospital's argument, challenging the outcome of the case before the board. Yeah, this is a little awkward, because we've got, as it were, appellants on both sides. And we discussed it. We all decided, if it's okay with the court, that this was the best way to proceed. So go forward, but make sure you save enough time, because you're going to, in a sense, be the appellee on the other. Right. If the board needs my help. We urge the board to require that the standard formal notice to employees concerning the violation be emailed to employees via the hospital's intranet. The board's decision in this regard is quaint, despite having entered the realm itself of e-filing and being familiar of necessity with the E-Government Act of 2002 and the Paperwork Elimination Act of 1998. At the end of 2007, the board decided, denied our request for emailing of the notice to employees, because they said it wasn't clear that this employer customarily communicates with its employees electronically. Is that the standard, that is to say, communicate in the way that the employer customarily communicates? No. The standard for notice to the employees with the traditional posted paper notice, posted on bulletin boards or other conspicuous places, is that the notice should be posted in conspicuous places. There have been a number of requests to the board that they enter the modern era and make quite conspicuous distribution, or require the respondent to, by emailing. They haven't decided to do so yet. But the posting is still in effect. They still do that? They still do that. And do you have an argument that, in fact, the employees remained ignorant of this ruling, or you just wanted to go to them right here? Well, the case isn't finished yet, so the employees have received nothing. Oh, I see. I'm sorry. Okay. This sounds very much like a kind of policy judgment that I think we're ill-equipped to address, at least in the confines of a particular case. Frankly, I'd be concerned that spam filters would filter out the notice to most people. No, this is to employees at their employer email address. If my spam filter didn't take out something from, I don't know, some unknown governmental body that might be from Nigeria, I'd be very unhappy with my spam filter. But this is not coming from the NLRB. The NLRB would require the hospital to disseminate the notice electronically through its own internet. This is from my employer. The first thing I delete. I don't want to read those. What I really mean, how can we address this in a particular case? There's so many considerations that don't arise from the facts of the particular case. Well, you can judge this by the board's own logic. Their view, they didn't make a policy decision. They said, our standard is, has the employer customarily communicated with employees through their internet? The board said, no. You can review the board, as you always do, for substantial evidence on that point. And the substantial evidence that exists in this record, but there was no evidence of noncommunication through the internet, and we have quite a large amount of evidence of the employer using the internet, for example, for communication regarding personnel policies. The full gamut of personnel policies are available to employees on the internet. The nurses are required to host patient incidents. That's not the same as e-mail. I mean, maybe they should post it on the internet, but that's really not what you want either. Well, nurses are required to send e-mail to the employer when there are patient incidents, a very important matter. That is the customary requirement. So as to these two important topics, if nurses are to either transmit or obtain information, they use the internet. That's substantial evidence of customary communication with employees. You know, I'm inclined to leave this one alone, and I want to make sure you save enough time because there's some more important substantive issues, or actually there are some important substantive issues as to which you do need to respond later on. All right. I'm going to save ten minutes. Yeah, okay. Good morning, Your Honor. My name is Ray Carey, and I represent Valley Hospital. I'd like to preserve three minutes, if I may. Are we going to hear from the Board? Yes. At what point? After both arguments. And how long are you going to take and how long does the Board go? I think I have 15 minutes total, so I'll take 12 minutes. Each of you don't have 15 minutes. Then I misunderstood. I'm the appellant. You have 30 minutes for the case. And I have 15 minutes for both arguments. That's your understanding. Well, that's not necessarily a lie. But that makes 45 minutes, and we'd allocated 30. Talk fast. Okay. Let me just make it simple, and I'm not going to comment on the remedial issues that Glenn was talking about. However, I think there's a reason why this court or this case is in front of you rather than in the District of Columbia circuit where, quite frankly, the hospital probably would have brought this case if it had initiated the appeal. And that's because the Ninth Circuit has not addressed this issue specifically before, and I'll comment on the Sierra decision that Judge Fletcher is very familiar with. You say this issue. What issue now? The issue being whether public statements published by an employee disparaging his or her employer are grounds for discharge and are not indicative of protections under Section 7 of the National Labor Relations Act. That's what this case is about. Ms. Wells was a former nurse whose employment was terminated because in three publications, she publicly disseminated from the hospital's perspective false and defamatory statements that, in general, challenged or questioned the quality of care provided at the hospital where she worked at the time. As a result of an investigation and as a result of information that she either supplied or refused to supply, at the time of the investigation, ultimately, her employment was terminated. And in that context, I may want to suggest that in my view and the hospital's view, the inquiry should start at the time the employer was making the decision, not two or three years later when the issue was challenged in front of the NLRB. And the question was, what did Valley Hospital know? What was the information it had available to it at the time the decision was made to terminate Ms. Wells' employment? This is not a discrimination case. It's purely whether her conduct was protected by Section 7. And that determination ought to be made retroactive to the information that was conveyed at the time of the termination, not what came out for the first time at a trial. Well, it can't be merely the information that the hospital knows. It has to be the information that the hospital should either have known or under the circumstances should have inquired about and have learned. And it did. And that's my point, Your Honor. And I think it's all in the facts in the brief. But let me just try and narrow down the issues, particularly since my time is limited. If you read, and I'm assuming you have, the NLRB decision that came out in December of 2008 or 2007, I believe it was, there really is very little disagreement over the facts. There is more disagreement over whether the Board appropriately applied the law to the facts and the law as it relates to two things, what constitutes maliciously false statements published about an employer and or what constitutes disloyalty, either of which is grounds for termination of employment under Ten C of the National Labor Relations Act and is not indicative of Section 7 protected activity. In this context, in three publications, Ms. Wells publicized, in effect, statements that questioned the quality of care, fact-based statements, not rhetorical hyperbole or mere opinion like the opinion might want to suggest. But if you look at the statements, which are all in the record, it was fact that she tied up to question whether the quality of care at Valley Hospital was compromised, in effect. Under Board law, that should have been grounds in and of itself for the Board to sustain the discharge in a finding of no Section 7 violation. That closes our eyes to the labor dispute, because the staffing issue was clearly a part of the union's issue with the hospital. Whether or not there's a labor dispute does not allow someone to publicly disparage their employer or to, with false, maliciously false and untrue statements or statements that are indicative of disloyalty. But as I read the record, I think that the Board, it seems to me that the Board was within its sort of boundary of what the facts were to conclude that these were not maliciously false. And as I said, I think that under the circumstances, because this is a question of law, I think you can do de novo review, because the Board did not apply Jefferson's standard, which is the seminal Supreme Court case that determines these issues, and it also didn't apply its own precedent correctly. But most importantly, the only decisions that have squarely addressed this issue as it applies to Ms. Wells, there's three of them. The St. Luke's case, which is cited by all the parties in their respective briefs, the Endicott case, and then there's a case, Montefiore Hospital, involving the NLRB. All three of those cases on similar facts sustained determination of employment and found that there was no Section 7 violation and no Section 7 protected conduct, even though the statements may have been published in the context of the labor dispute. The labor dispute is only one component of the issue that has to be assessed. And the question is, what's the character of the statements? And there's only one case that I'm aware of right now in the Ninth Circuit, and Judge Fletcher is the author of that. It's the Sierra. There are two Judge Fletchers on the circuit. There's B. Fletcher and there's W. Fletcher. Oh, I'm sorry. I thought B. Fletcher was here. No, B. Fletcher is, I think, in Seattle at the moment. I'm sorry. My apologies. These are fungible at some level. My apologies. But there's only one decision that I'm aware of where this issue was even approximately addressed, and it was involving Sierra Publishing Company. In that case, if you scrutinize it, you'll find out there was no public disparagement of that particular employer, there was a labor dispute, there was a finding of absolutely no disparagement of that employer, and the holding of that case was predicated on those factual issues. All of the other cases that the Board and the SEIU rely upon, Brockton Hospital, the Roanoke Hospital case, all of those cases, the reason why the conduct was deemed to be protected as opposed to unprotected was either because they were internal communications rather than public communications, there was no false and disparaging statements published to the public about their employer. Now, in order for you to win, do you need to convince us that the statements were false and disparaging? No. There's two inquiries. A true statement is not protected? A true statement, no. A true statement, if it also is published in a manner that's indicative of disloyalty, is not protected. And what does disloyalty mean? Disloyalty means that you publicly disparage. That a true statement is going to put you in a bad light? Well, if you publicly go out to the public and accuse your employer of being, of having poor quality of patient care, that would be a disloyal statement. But what if it's true? Doesn't disloyalty even if it's true and we're in the middle of a labor dispute have precisely that question? The only thing I can ask or answer that question, Your Honor, is under Jefferson's standard, it's in a disjunctive rather than a conjunctive. It's either malicious. But if that's right, that any true statement that puts the employer in a bad light, in the middle of a labor dispute as to which this is a relevant question, that pretty much shuts down an awful lot of talk. Well, I'm not telling you that, in my view, that's not an issue we're dealing with, and I don't think an employer would take the kind of serious action that was taken in Ms. Well's case based on true statements. But what we're dealing with here. Why not? If they identify her as the leader of this strike, that could be a good way, reason to get rid of her. Well, I'm not sure that, you know, even that issue was there. She certainly was a leader within the union. It's not beyond imagination. You're trying to ask us to make a statement of law,  I'm not asking that. I'm asking that Jefferson Standard, the decision of the United States Supreme Court, be applied correctly to the facts of this case, which the Board failed to do. And I'm suggesting to you that the decisions in St. Luke's, Montefiore, Endicott, are decisions that are analogous to this and indicative of the appropriate inquiry that ought to occur. The cases upon which the Board and the SEIU rely upon do not address these issues. They are factually distinguishable because of true statements being published, because they were internal communications only to employees rather than the general public, or there was no disparagement of any kind, or they were pure opinion. And that's not what we have here. We have false facts that she used in order to publicize on three different occasions that the quality of patient care at Valley Hospital was compromised. She also refused to cooperate in the investigation to give any detail, and she left the hospital when the investigation took place, and she left the hospital with no choice but to determine what discipline was appropriate under the circumstances. And under those circumstances, the decision was made to terminate. I will tell you that if these statements had been communicated and confined from an internal point of view, from a pure labor dispute point of view among those that were affected by these issues, we wouldn't be here. We're here because the statements were published to the community at large. But the community is exactly who they're meant to be published to for issues of staffing. Let's assume for the moment the hospital is short-staffing. It knows it. It probably doesn't need to be told by the nurse that they're short-staffing, but maybe they decided to do that to save some money. So who else are you supposed to talk to if you want to communicate that fact? Those were untrue facts. Well, see, the board didn't find them to be untrue facts, described them as, what, hyperbolic or something like that, but said, in fact, there was a germ of truth. And I'm suggesting to you in order to do that analysis that you're talking about, Judge Clifton, I think you have to apply New York Times v. Sullivan, Gertz v. Robert Welsh, which deals with opinion. And you will find, I think, on an appropriate analysis, that those are not statements that even under the Welsh line of cases would be indicative of pure opinion. And then under St. Amant v. Thompson, you will find that the evidence indicative of reckless disregard for the truth is in the record. I appreciate the desire to introduce this to more interesting First Amendment considerations, but that's not what the board talked about. The board said it wasn't untrue. Hyperbole, but not untruth. And they didn't follow the law when they made that conclusion, because I think that the malicious untruth analysis. This is a factual question. I'm puzzled as to why you're talking about law rather than fact. Was it true or not?  They weren't true. But what I'm saying is this. Blaine, wasn't it true that they'd cut down to two telemetry people? No. Wasn't it true that at some point a nurse found herself responsible for four patients in ICU? No. It was never written on the board? No. As I said, the record is. . . How am I supposed to know that when I've got testimony on the record that says it was written on the board? No, there's testimony on the record that it never happened. Well, there's also testimony that it did. No, there was testimony on the record that a charge nurse was writing, but not assigning people, writing trying to figure out a problem that occurred, I believe, on October 7th. And when some people called in, there was high acuity in the hospital, and she's trying to figure out how to address staffing and other issues. Nobody was ever assigned four patients. Nobody was ever involuntarily assigned three patients. But I think the record is very clear that in the end that didn't happen. But it's also clear that when the stuff went up on the board, there was objection by the nurses. Quite frankly, that's an issue that's out there that in my view is unprotected activity on the nurses' part, but the actual facts are no one was ever assigned involuntarily more than two high acuity patients. That's uncontroversial. It depends on what you mean by the word assigned. If you say no one in fact ever worked in that capacity, that may be right. But assigned prior to the nurses saying, wait a minute, this is not what we're going to do, I'm not sure that's right. Nobody was ever assigned before the workout. It depends on what you mean by the word assigned. All I'm saying is they were coming in, they hadn't even taken the report yet, and they had clocked in and decided things were happening before they ever talked to anybody, and then that's when the walkout took place. There was never any assignment and never any intent, and there's nothing in the record that suggests that anybody was assigned anything more than two high acuity patients at that time. I don't think that's a disputed fact. High acuity also being an addition, because that doesn't cover all the patients in the ICU. As I said, nobody, there was one temporary employee who volunteered to take three low acuity people until the people could come in that were called in. That was not an involuntary assignment. When you start slicing it thinner, you move away from being able to say you've got a statement that's maliciously false. First of all, there's three different sets of statements. That's October 7th. There were two on September 13th. All three of them separately on different alleged facts publicly accused the hospital of poor quality of patient care. I think we've got that. Anything else before you want to sit down? All I'm saying is I just ask you to look closely at the decisions upon which the board and the SEIU rely upon, and you'll find those facts are completely distinct from these. Thank you. May it please the Court. And if we can ask you to speak fast also. I shall, Your Honor, although I'm not known for that. But with respect to the union's brief, the board would stand on its brief and submit that case. And so I would just move to the hospital's contention. And I would submit with respect to that that the hospital does, as the Endicott and the St. Luke's courts incorrectly did, and that is to read Jefferson's standard as supplying some fixed rule of law that the board is required, under all circumstances, to follow, rather than at least allowing the board to evolve the Jefferson's standard guidelines in the context of labor disputes. And I submit that, in particular, Jefferson's standard has to be read in light of Washington aluminum, the 61 Supreme Court case, that specifically disavows looking at the means by which employees present their labor dispute, as well as Chevron, which sets the standard for review of agency conduct. And this Court's own opinion, contrary to what the hospital has maintained, is directly on point to this case. In Sierra, the statements were made to customers of the newspaper, and telling the customers that their employer was suffering declining circulation and essentially not managing the paper well. And it was also, and it was in the context of that labor dispute. So, unlike the hospital's arguments, Sierra is directly on point here. In fact, Sierra discusses many of the cases, and the board's analysis and refinements simply recognizes the board's authority to refine the Jefferson's standard analysis. One of the cases- I mean, it went by quickly, but Mr. Is it- I'm sorry, is it Mr. Young? That's me. Oh, it's Mr. Carey. Okay, I'm having trouble with my list. It seems to suggest that we review the factual determinations by the board de novo. Is that right? Or did you say- No, no, no. The answer is in evidence, but the question is the law. Of course, I'm sorry. Okay. And, of course, I don't agree that this requires de novo review. This is a question of- Substantial evidence as to the factual determinations. Yes. And the rule of law here applied is Jefferson's standard, and the board should be reviewed under deferential Chevron standard. And, again, I was about to say with respect to Sierra, for example, Sierra criticized and expressly disavows Red Top, another Eighth Circuit case, which St. Luke relies on. This court simply does not hold to the rigid view that Endicott and St. Luke's does. And we submit that this court should continue to adhere to that precedence. And as I said in Sierra, the court goes through a comprehensive analysis, unlike anything done in either Endicott or St. Luke's, about how the Jefferson standard, what the Jefferson standard means and how it has evolved, and discusses both board and court cases involving the Jefferson standard issue. And as long as the court follows that precedent, we submit that we should be entitled to enforcement of the board's order. Thank you. Thank you. I'm not sure the board needs my help, but there are a few things I'd still like to say, and I'll try to do it quickly. First, I do want to just give a nod to some other judge Fletcher's opinion in Sierra Publishing, a particular aspect of it. The court, this court, by the way, took Jefferson standard, took each of the factors addressed in Jefferson standard for the disloyalty analysis, whether there was a labor dispute, the requirement that the speech be evaluated in that context, whether impulsive comments, for example, made during a media interview present a context that is viewed with some leniency, whether the expression was maliciously or recklessly false, and finally, whether the expression was so egregious as to remove the speaker completely from the protection of Section 7 of the National Labor Relations Act. What Judge Fletcher said in Sierra Publishing then is the relative weight, and this is at 218 of 889 of 2nd, the relative weight to be given each of these factors can be debated, but we conclude that the board acted appropriately in considering them. We further conclude that there is substantial evidence in the record to support the board's determination. So all of these factors were appropriately considered by the board. If you look at the board's decision in this case, which I'm sure you have, it essentially tracks the analysis of Sierra Publishing and the factors that are relevant. It considers the factors. It gives a rational explanation for why it's coming to the conclusion. It does on those factors, and it weighs the facts. Now, as to the facts, the standard is substantial evidence, and that's judged by an abusive discretion standard. I don't think this Court, if it were reviewing a jury verdict in a case with these factors and these facts present, would decide to substitute that weighing and sifting of evidence that was done by the jury in this case. I'm glad to hear mention made of New York Times v. Sullivan by counsel for the hospital. That case establishes the actual malice standard. That is precisely the standard, not by that name, not by that case name, that the board applied here, and with good reason. Section 7 of the National Labor Relations Act is a protection of the right of employees to speak out concerning wages, hours, and working conditions. If they can't do that without the chill that comes from being held strictly accountable for any falsity, then Section 7 is being lost. Thank you. Thank you. And, Mr. Kerr, you get a chance to respond. Just briefly, Your Honor, we support, obviously, the board's brief as it relates to the remedial aspects that are on review from the SEIU's petition. But let me tell you, again, Sierra Publishing doesn't apply. The statement at issue in Sierra Publishing was, and the one that was dispositive, is an opinionated statement that the paper was speeding downhill because of the labor dispute and the inability to resolve it. That the paper was, quote, speeding downhill because of the inability to finalize labor negotiations or resolve the issue that was pending at the time. The opinion makes... It was the context. It was the number two newspaper in a two-newspaper town. All right. But the opinion also makes clear, and this is the basis for the opinion, there was no disparagement of the journalistic quality of the paper, the nuts and bolts of its business. That's not what we have here. The statements were fact-based, and they disparage patient care at Valley Hospital. They were not only fact-based from the standpoint of factual assertions. They were false factual assertions, and the record discloses that. So they were both maliciously false, but separate from that, they were also disloyal because they went public with those statements. And even under the rationale of Sierra Publishing, in conjunction with St. Luke's, Endicott, Montefiore, and Jefferson Standard, the board's decision is erroneous on the law, and there's no substantial evidence to support it, and the decision should be reversed. Okay. Thank you. I think we managed to get all the issues argued within a reasonable amount of time. Thank you for good arguments. The Nevada Service Employees v. NLRB is now submitted for decision. Let me check with my fellow panelists for just a minute.
judges: Hall, Fletcher W. , Clifton